**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| KATHLEEN D. KENNEY,<br><br>                            Plaintiff,<br><br>        v.<br><br>PIER 1 IMPORTS, INC., ALEXANDER W. SMITH, and CHARLES H. TURNER,<br><br>                            Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kathleen D. Kenney ("Plaintiff"), by and through the undersigned attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes, without limitation: (i) a review and analysis of regulatory filings made by Pier 1 Imports, Inc. ("Pier 1" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) a review and analysis of press releases and media reports issued and disseminated by Pier 1; and (iii) a review of other publicly available information concerning Pier 1.

## SUMMARY OF THE ACTION AND OVERVIEW

1.      This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired shares of Pier 1 from December 19, 2013 through February 10, 2015 inclusive (the "Class Period").  Plaintiff seeks to pursue remedies against Pier 1 and certain of its officers for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Pier 1 is a retailer of decorative home furnishings and gifts imported from countries around the world.  Pier 1 maintains over 1,000 stores in the United States and Canada and operates as one segment consisting of the retail sales of decorative home furnishing, furniture, gifts, and related items.

3.      Throughout the Class Period, Defendants made false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose the truth regarding the Company's business prospects and financial condition.

4.      On December 19, 2013, Pier 1 announced that its financial condition was improving in that the Company had achieved "solid third quarter financial results," especially following a disappointing prior quarter.  In that press release, the Company touted its "1 Pier 1" business initiative aimed at combining e-commerce and in-store buying experiences to create one Company and one store for its customers thereby resulting in increased sales from both online and in-store purchases.  The press release further stated that its e-commerce business through "Pier1.com continues to outperform…," that it has been a "resounding success," and that management anticipated that this sales channel would be "an important growth driver going forward."  On this news, shares of Pier 1 common stock rose approximately 5%.

5.      On January 8, 2014, Pier 1 continued to tout the success in executing the Company's 1 Pier 1 strategy.  The Company further reported that website traffic had increased significantly and that it had seen progressive increases in e-commerce sales as a percentage of total Company sales.

6.      In April 2014, the Company continued to promote the success of its 1 Pier 1 strategy, stating that its new POS system had been fully implemented in August 2013 and that

traffic to the Company's website had increased significantly and sales from e-commerce had progressively grown as a percentage of total Company sales.

7.      On July 19, 2014, the Company issued a press release whereby it continued to promote the success of its e-commerce business, stating that it had experienced progressive increases in e-commerce sales as a percentage of total Company sales. The Company further represented that these sales accelerated in the first quarter of fiscal year 2015, with e-commerce sales reaching 9% of total Company sales. The Company also stated that because of the success in the e-commerce business, and the success of its 1 Pier 1 omni-channel strategy, the Company expected to achieve e-commerce sales of at least $200 million in fiscal year 2015 and e-commerce sales of at least $400 million in fiscal year 2016.

8.      On October 8, 2014, the Company filed its Form 10-Q with the SEC and related press releases whereby the Company repeated the continued success of its e-commerce business and the 1 Pier 1 omni-channel strategy as well as reaffirming the Company's projected sales for 2015 and 2016.

9.      On January 7, 2015, the Company filed its Form 10-Q with the SEC and related press releases whereby the Company repeated its prior sales projections in October.

10.     Approximately two weeks prior to its year end, on February 10, 2015, the Company surprised investors by reducing its financial guidance for the fiscal year ending February 28, 2015. Pier 1 blamed the sudden change in its outlook on softer than expected sales in January and February 2015 and "unplanned" expenses, primarily related to incremental supply chain costs. Pier 1 also announced that the Company's Chief Financial Officer ("CFO") Charles H. Turner – a 23 year veteran with the Company – had "retired."  On this news, shares of Pier 1 plummeted to $12.84, or approximately 25%, on trading of over 36 million shares.

11.     As a result of Defendants' wrongful acts and omissions, Pier 1 stock traded at artificially inflated prices during the Class Period, and Plaintiff and other Class members suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27(c) of the Exchange Act (15 U.S.C. §78aa(c)). Many of the acts complained of herein, including the dissemination of materially false and misleading statements and reports prepared by or with the participation, acquiescence, encouragement, cooperation, or assistance of Defendants occurred, at least in part, in this District.  Additionally, Pier 1's headquarters are located at 100 Pier 1 Place, Fort Worth, TX, 76102 in this District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15.     Plaintiff Kathleen D. Kenney, as set forth in the accompanying certification, incorporated by reference herein, purchased Pier 1 shares during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant Pier 1 is a retailer of home furnishings and decorations incorporated in Delaware and headquartered in Fort Worth, Texas.  Pier 1 shares are traded on the New York Stock Exchange ("NYSE") under the symbol "PIR."

17.     Defendant Alexander W. Smith ("Smith") is the President and Chief Executive Officer of Pier 1.

18.     Defendant Charles ("Cary") H. Turner ("Turner") was the CFO of Pier 1.   On February 10, 2015, the same day that the Company announced its guidance revision, the Company also announced Turner's sudden retirement.

19.     Defendants Smith and Turner are referred to herein as the "Individual Defendants."

20.     Pier 1 and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Pier 1 operates as a retailer of furniture, decorative home furnishings, dining and kitchen goods, candles, gifts, and other specialty items for the home.  The Company has over 1,000 stores in both the United States and Canada that are typically free-standing units near shopping centers or malls.

22.     Although Pier 1 has traditionally been a "bricks and mortar" retailer, during fiscal year 2013 (Pier 1's fiscal year begins March 1 and concludes February 28), the Company began to aggressively grow and develop on-line sales of its products.

23.     Specifically, on August 23, 2012, the Company announced the official launch of its new e-commerce website, Pier1.com.   The Company launched Pier1.com as part of its 1 Pier 1

omni-channel initiative that sought to turn Pier 1 from an in-store retailer to an in-store **and** online combined retailer.

24.    The Company stated that the new website would allow customers to purchase products online and have them shipped directly to the Pier 1 store of their choice without incurring shipping charges.  The Company further stated that the new e-commerce website would allow for easier navigation to locate the Company's products while maintaining Pier 1's renowned "treasure hunt" feel.  With regards to the new e-commerce website, Defendant Smith stated: "We are extremely delighted with the successful launch of our new e-Commerce enabled website, Pier1.com, which allows customers to shop our unique array of merchandise while selecting the shipping destination of their choice."

**Materially False and Misleading
Statements Issued During the Class Period**

25.    On December 19, 2013, the first day of the Class Period, the Company published its 2014 fiscal third quarter ("3Q2014") results.  Despite disappointing results that were announced just three months earlier, the Company suddenly announced that it had delivered "solid third quarter financial results."  In that press release, the Company attributed this in part to its "promotional marketing stance" that "drove strong traffic" and touted the progress made with the 1 Pier 1 omni-channel initiative.

26.    In a conference call that same day, Defendant Smith touted the Company's financial results and specifically noted the "strong levels of operating performance," "robust sales growth," and "broad-based strength across virtually all of our product categories."

27.    Defendant Smith further reported that the 1 Pier 1 omni-channel initiative "continues to gain momentum" and that "[w]e couldn't be more thrilled about the opportunity that the a strong and growing e-commerce presence affords us."  Smith further stated that "[o]ur

customer base is expanding both in size and quality" and "[o]ur plans for fiscal 2015 are well underway and *we expect a strong year as we have huge confidence in our ability to execute our 1 Pier 1 omni-channel strategy and continue to build market share.*"  [Emphasis added.]

28.     On the same day, Defendant Turner stated "[Pier 1] continue[s] to be pleased with the level of improvement we're seeing throughout the portfolio, in both comp store sales growth and overall productivity."  Smith further stated the Company's financial guidance for the fourth quarter, "[t]otal sales growth in the high-single digit range, comp store sales growth in the mid-single digit range and earnings per share in the range of $0.60 to $0.66, representing year-over-year growth of 9% to 20%."

29.     As a result of Defendants' statements, the price of Company stock rose significantly, approximately 8%, rising from $13.90 on December 18, 2013 to close at $15.18 on December 19, 2013 on volume of over 12 million shares traded.

30.     In its Form 10-Q filed with the SEC on January 8, 2014, Pier 1 reiterated its continued success in executing the Company's 1 Pier 1 strategy:

**Management Overview**

* * *

*The Company is making advancements in expanding its omni-channel strategy and executing its '1 Pier 1' vision.* One of the key areas of focus is an expected seamless integration of the Company's increasingly interconnected businesses – its Pier 1 Imports stores and its website, Pier1.com. Since the launch of Pier1.com during July of fiscal 2013, traffic to the website has increased significantly, and the Company has seen progressive increases in e-Commerce sales as a percentage of total Company sales. In addition, the Company executed website upgrades during fiscal 2014, which continue to enhance the customer experience and improve back-office systems.

* * *

7

> Management believes that the Company's sales will continue to improve as a result
> of its unique and special merchandise assortments, superior in-store experience and
> enhanced e-Commerce experience.

[Emphasis added.]

31.     Analysts likewise believed Defendants' statements and adjusted their guidance accordingly. For example, on January 14, 2014, analysts with Wedbush, after meeting with Company executives including Defendant Turner, reiterated their outperform rating on Company stock, specifically citing the 1 Pier 1 program: "Overall, we remain optimistic that Pier 1 should continue to execute its 1 Pier 1 strategy. [...] Holiday is over, inventories are in good shape entering 2014, new spring merchandise looks good, compares are easy, and we continue [to] like the long-term 1-Pier-1 strategy."   On February 28, 2014, Barclays increased its projected multiple on Company stock from 14x earnings per share to 15x earnings per share, stating: "The higher multiple largely reflects the company's traction with ecommerce penetration and its overall '1 Pier 1' strategy."

32.     Defendants continued to tout their strong sales growth, driven in part by their e-commerce business.  Specifically, on an April 10, 2014 earnings call, Defendant Smith claimed that:

- "..I'm highly confident that *Pier 1 Imports is positioned for substantial growth in the coming years*."

- "…[we're] at the beginning of a new chapter as we tap into THE enormous potential that our omni-channel strategy gives us."

- "*Sales growth in fiscal 2015 will be substantial*."

- "Strategically, I believe *we're in the best shape we've ever been and look forward to a year of strong growth in fiscal 2015*."

[Emphasis added.]

33.     Analysts continued to buy into management's statements.  For example, on April 10, 2014, analysts with Wedbush reiterated their outperform rating on the Company, repeating that "we continue [to] like the '1-Pier-1' omni-channel strategy."  On April 10, 2014, Barclays specifically pointed to Defendants' comments, stating that "[m]anagement was very positive on progress made with the e-commerce business, noting significant traction in driving higher levels of traffic."  On April 15, 2014, Barclays upgraded its guidance on Pier 1 from Equal Weight to Overweight, putting a great deal of emphasis on the Company's e-commerce strategy, noting that "accelerating e-commerce growth should be supportive of EBIT by 2015E."  Similarly, on April 17, 2014, Deutsche Bank Securities stated that, for Pier 1, "[e]commerce remains a point of strength... and investment."

34.     Likewise, in its Form 10-K filed on April 29, 2014, continued its string of misstatements:

**Management Overview**

* * *

Although the Company encountered some challenges during the year and concluded with a tough fourth quarter, pressured by significant weather disruption, *it made excellent progress in the execution of its '1 Pier 1' strategy, which is the Company's plan to evolve from a store-only business model to one with full omni-channel capabilities.* Through the '1 Pier 1' strategy the Company expects to maximize selling opportunities, extend brand reach and capture greater market share. The Company's focus is to ensure that customers have an extraordinary experience, regardless of how they shop.

* * *

One of the critical components of '1 Pier 1' is the new POS system, which was fully implemented in August 2013. The stores are now positioned to more effectively serve as a gateway to the Company's e-Commerce website and the e-Commerce website continues to serve as a gateway to the stores. Since the launch of Pier1.com

during July of fiscal 2013, traffic to the website has increased significantly, and the Company has seen progressive increases in e-Commerce sales as a percentage of total Company sales. In addition, the Company executed website upgrades during fiscal 2014, which continue to enhance the customer experience and improve back-office systems.

* * *

Management believes that the Company's sales will continue to improve as a result of its unique and special merchandise assortments, superior in-store service and enhanced e-Commerce experience.

[Emphasis added.]

35.     On June 19, 2014, Pier 1 released its first quarter of 2015 results and adjusted downward its fiscal year 2014 earnings per share guidance.  The Company reported that total sales were $419.1 million, which was a 6.1% increase compared with the first quarter of the prior year. The Company further reported that e-commerce sales comprised 9% of total sales. This would indicate that Pier 1 brought in an estimated $37.7 million in online sales during the quarter. Defendant Smith noted that Pier 1's growth in its web sales supported the Company's strategy to use its to support its e-commerce site: "Our stores continue to serve as an important and productive gateway to Pier1.com, with approximately one-quarter of our online transactions originating at the store and one-third of orders placed at home being picked up in-store."

36.     During the earnings call on June 19, 2014, Defendants continued touting the 1 Pier 1 initiative and the omni-channel capabilities.  Defendant Smith stated that "[l]ast fiscal year was transformational… . we generated strong traffic to the Pier 1 Imports brand and achieved a company comparable sales gain of 6.3% against a backdrop of a challenging retail climate."  Smith further stated that the Company was delighted "with the dramatic increase in e-commerce and how the advantages of the 1 Pier 1 strategy have been embraced by our customers. . ."  Smith further noted that the e-commerce growth was succeeding: "Based on the momentum we are experiencing,

we are revising our e-commerce growth expectations for fiscal 2015 and 2016." Smith further

stated: "We are delighted with the dramatic increase in e-commerce and how the advantages of 1

Pier 1 strategy have been embraced by our customers both new and returning.," and added:

"[w]hen we planned fiscal 2015, we did not expect our customers to engage our brand through

Pier1.com with quite this much enthusiasm."

37.     On July 9, 2014, the Company filed its Form 10-Q with the SEC, in which the

Company reported continued growth and success with its e-commerce business:

**Management Overview**

* * *

The Company has continued to focus on the execution of its '1 Pier 1' strategy, which is the Company's plan to evolve from a store-only business model to one with full omni-channel capabilities. Through the '1 Pier 1' strategy the Company expects to maximize selling opportunities, extend brand reach and capture greater market share. The Company's focus is to ensure that customers have an extraordinary experience, regardless of how they shop.

* * *

Since the launch of Pier1.com during July of fiscal 2013, traffic to the website has increased significantly, and the Company has seen progressive increases in e-Commerce sales as a percentage of total Company sales. ***This trend accelerated in the first quarter of fiscal 2015, with e-Commerce sales reaching 9% of total Company sales. In response to the early success of its '1 Pier 1' omni-channel strategy, the Company now expects to achieve e-Commerce sales of at least $200 million in fiscal 2015, and e-Commerce sales of at least $400 million in fiscal 2016.*** This compares to previous expectations for e-Commerce sales to comprise 10% of total sales by the end of fiscal 2016. The Company continues to expect to reach $225 of sales per retail square foot, which includes all retail sales except direct-to-customer orders placed outside of a store, and operating margins of 11% to 11.5% by the end of fiscal 2016.

[Emphasis added.]

38.     On September 17, 2014, Pier 1 issued their quarterly financial statements for the

second quarter ended August 30, 2014.  Although the Company reported revenues of $418.62

million, it had forecasted $426.30 million in revenues.  During a conference call on that same day,

the Company announced that its e-commerce business was expanding better than anticipated: "We anticipated that the transformation from a highly profitable retail store format to an equally compelling omni-channel business, which we call 1 Pier 1, would be gradual.  But things are playing out better and differently than we expected with e-commerce accelerating rapidly."

39.     On October 8, 2014, the Company filed their Form 10-Q with the SEC and stated as follows:

**Management Overview**

* * *

The Company has continued to focus on the execution of its '1 Pier 1' strategy, which is the Company's plan to evolve from a store-only business model to one with full omni-channel capabilities. Through the '1 Pier 1' strategy the Company expects to maximize selling opportunities, extend brand reach and capture greater market share. The Company's focus is to ensure that customers have an extraordinary experience, regardless of how they shop.

The Company has set out operational and financial goals supporting its omni-channel evolution. This includes six key guideposts to monitor the transformation of the Company to a mature omni-channel retailing business. These guideposts include Brand Traffic, Conversion and Average Ticket; Stores as Sales and Customer Experience Centers; Merchandise Margin and Gross Profit; Fulfillment and Home Delivery; Selling General and Administrative Expenses; and Capital Allocation.

* * *

Since the launch of Pier1.com during July of fiscal 2013, traffic to the website has increased significantly, and the Company has seen progressive increases in e-Commerce sales as a percentage of total Company sales. This trend continued in the second quarter of fiscal 2015, with e-Commerce sales reaching 9.7% of total Company sales. In response to the early success of its '1 Pier 1' omni-channel strategy, the Company expects to achieve e-Commerce sales of at least $200 million in fiscal 2015, and e-Commerce sales of at least $400 million in fiscal 2016. This compares to previous expectations for e-Commerce sales to comprise 10% of total sales by the end of fiscal 2016.

40.     On December 18, 2014, the Company announced its third quarter of 2015 results. In the accompanying press release, Defendant Smith claimed:

We are confident that the value proposition created by our exclusive and unique product remains strong, and our refined promotional strategy—which benefitted this period—will contribute to gradual improvement in our gross margin rate over the coming quarters.   We have in our stores and online business two mutually supportive and interdependent vehicles to **drive long-term, profitable growth**.

[Emphasis added.]

41.     On a conference call the same day, Smith avowed that "**[***t***]*he transformation of Pier 1 Imports from one of the most profitable bricks-and-mortar home specialty stores [into] what we fully expect to be one of the most sophisticated and profitable omni-channel retailers continues*.**"  [Emphasis added.]

42.     On this news, the price of the Company's stock rose, from $13.90 on December 18, 2014 to $15.18 on December 19, 2014.

43.     Once again, analysts relied on these misstatements.   On December 19, 2014, Deutsche Bank stated: "PIR keeps plugging along on its 1-Pier-1 strategy[.] We applaud the company for managing through some near-term choppiness and moving forward on the crucial exercise of becoming a truly omni-channel company."   Also, on December 19, 2014, BB&T again stated that "Pier 1 continues to make strides on '1 Pier 1' omni-channel strategy."

44.     In its Form 10-Q filed January 7, 2015, Pier 1 made further misstatements:

**Management Overview**

* * *

The Company has continued to focus on the execution of its '1 Pier 1' strategy, which is the Company's plan to evolve from a store-only business model to one with full omni-channel capabilities. Through the '1 Pier 1' strategy the Company expects to maximize selling opportunities, extend brand reach and capture greater market share. The Company's focus is to ensure that customers have an extraordinary experience, regardless of how they shop.

The Company has set out operational and financial goals supporting the '1 Pier 1' strategy. This includes six key guideposts designed to monitor the transformation of the Company to a mature omni-channel retailing business. These guideposts are: Brand Traffic, Conversion and Average Ticket; Stores as Sales and Customer

Experience Centers; Merchandise Margin and Gross Profit; Fulfillment and Home Delivery; Selling General and Administrative Expenses; and Capital Allocation.

The Company views its stores and e-Commerce website as an integrated business. The stores are becoming sales and customer experience centers and are positioned to serve as a gateway to the Company's e-Commerce website and the e-Commerce website serves as a gateway to the stores. During the third quarter of fiscal 2015, the Company continued to focus on the quality, not the quantity, of its real estate, in order to strengthen its real estate portfolio.

Since the launch of Pier1.com during July of fiscal 2013, traffic to the website has increased significantly, and the Company has seen progressive increases in e-Commerce sales as a percentage of total Company sales. This trend continued in the third quarter of fiscal 2015, with e-Commerce sales reaching 12.3% and 10.4% of total Company sales for the quarter and year-to-date periods ended November 29, 2014. In response to the early success of its '1 Pier 1' strategy, the Company expects to achieve e-Commerce sales of at least $200 million in fiscal 2015, and e-Commerce sales of at least $400 million in fiscal 2016. This compares to previous expectations for e-Commerce sales to comprise 10% of total sales by the end of fiscal 2016.

45.     Analysts continued to put faith in the Company's statements regarding its e-commerce rollout.  On January 8, 2015, Barclays stated: "we note that e-commerce – which comprised 12.3% of total sales at the end of fiscal 3Q – likely drove overall comp as the 1 Pier 1 strategy continues to gain traction."

### The Truth Finally Emerges

46.     On February 10, 2015, Pier 1 stunned the market when it issued a press release announcing that it was revising its financial guidance for the year ending February 28, 2015.  The Company stated that it had experienced "softer than expected sales" and "higher than forecast expenses."   In a separate press release the same day, the Company further announced that Defendant Turner was suddenly retiring (at the age of 58) effective *immediately*, or as one journalist noted that  "the expectations are now getting fairly grim" and "things don't look good for the home furnishing company."

47.     On this news, the stock dropped from the February 10, 2015 close of $16.97 to $12.84, or approximately 25%, on over 36 million shares traded.

48.     All told, **the stock dropped approximately 45%** from its Class Period high of $23.47.

49.     As analysts noted, by comparison, and despite Defendants' earlier claims that changes were industry-wide, Williams Sonoma, a prime competitor, had not missed on earnings since early 2012 and had **raised** its 2015 guidance.

50.     Analysts also noted their shock and disappointment in the true state of Pier 1's e-commerce strategy, which had been so consistently touted throughout the Class Period.  For example, on February 11, 2015, Credit Suisse stated that, regarding e-commerce, "the company has moved almost too quickly, and has not been equipped to deal with the transformation that is unfolding, including the many new costs and new processes that traditional retailers are not conditioned with. While those are the growing pains that many other retailers are now feeling, there is a question here of whether there has been an 'at any cost' mantra, resulting in the build out of an infrastructure that may not be scalable over time."  Similarly, BB&T stated on February 11, 2015 that "the company's plunge into omnichannel retailing has made its business much more difficult to manage and accurately forecast."

## CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities who purchased or otherwise acquired Pier 1 stock  from December 19, 2013 through February 10, 2015, inclusive.

52.     Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Pier 1 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

54.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, which is complained of herein.

55.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

56.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(i)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(ii)    Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Pier 1;

(iii)     Whether the price of Pier 1 stock was artificially inflated during the Class Period; and

(iv)     To what extent the members of the Class have sustained damages and the proper measure of damages.

57.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

58.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

59.     During the Class Period, Plaintiff and the Class purchased Pier 1 stock at artificially inflated prices and were damaged thereby.  When the misrepresentations that had been made to the market, and/or the information alleged herein to have been concealed from the market and/or the effects thereof, were revealed, the price of the Company's securities significantly declined, causing investors' losses.

## SCIENTER ALLEGATIONS

60.     Defendants acted with scienter because they: (i) knew the public statements issued or disseminated by Defendants in the name of the Company were materially false and misleading; (ii) knew that such statements would be issued or disseminated to the investing public; and (iii)

knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

61.     As set forth herein, Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Pier 1, their control over, receipt, and/or modification of Pier 1's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning Pier 1, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

62.     Pier 1 shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of Pier 1 stock and the market information relating to Pier 1, and have been damaged thereby.

63.     During the Class Period, the artificial inflation of Pier 1 stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Pier 1's business, operations, and financial prospects.   These material misstatements and/or omissions created an unrealistically positive assessment of Pier 1 and its business and financial condition, thus causing the price of the Company's securities to be artificially inflated at all relevant times and, when disclosed, negatively affected the value of the Company stock.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices and being damaged as a result.

18

64.     At all relevant times, the market for Pier 1 securities was an efficient market for the following reasons, among others:

(i)     Pier 1 shares traded on the NYSE with trading volume in the hundreds of thousands and millions of shares throughout the Class Period;

(ii)    Pier 1 regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(iii)   Pier 1 was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

65.     As a result of the foregoing, the market for Pier 1 shares promptly digested current information regarding Pier 1 from all publicly available sources and reflected such information in Pier 1's stock price. Under these circumstances, all purchasers of Pier 1 securities during the Class Period suffered similar injury through their purchase of Pier 1 securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

66.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge, or was reckless in not knowing, that the forward-looking statement was materially false or misleading and/or the forward-looking statement was authorized or approved by an executive officer of Pier 1 who knew, or was reckless in not knowing, that the statement was false when made.

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants

67.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

68.     During the Class Period, the Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Pier 1 shares at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Individual Defendants took the actions set forth herein.

69.     The Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Pier 1 stock in violation of §10(b) of the Exchange Act and Rule 10b-5. The Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

70. The Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mail, engaged and participated in a continuous course of conduct to conceal adverse material information about Pier 1's business, operations, and financial performance and prospects, as specified herein.

71. The Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Pier 1's value, performance, and continued substantial growth. These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Pier 1 and its business, operations, and financial prospects in light of the circumstances under which they were made, not misleading. As set forth more particularly herein, Defendants further engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Pier 1's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements and/or

omissions concerning the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

72.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Pier 1 stock was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Defendants, but not disclosed in public statements by the Defendants during the Class Period, Plaintiff and the other members of the Class acquired Pier 1 shares during the Class Period at artificially high prices and were damaged thereby.

73.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Pier 1 and its business and prospects, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Pier 1 shares, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

74.     By virtue of the foregoing, the Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

76.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77.     The Individual Defendants acted as controlling persons of Pier 1 within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

78.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

79.     As set forth above, Pier 1 and the Individual Defendants violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure with Plaintiff serving as a class representative;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 27, 2015                    Respectfully Submitted,


/s/ William B. Federman
William Federman (TX Bar #00794935)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone: 405-235-1560
Facsimile: 405-239-2112
wbf@federmanlaw.com
-and-
2926 Maple Avenue, Suite 200
Dallas, Texas 75201

Joseph P. Guglielmo*
Joseph Halloran*
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: 212-223-6444
Facsimile: 212-223-6334
jguglielmo@scott-scott.com
jhalloran@scott-scott.com

David R. Scott*
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Telephone:  (860) 537-5537
Facsimile:  (860) 537-4432
david.scott@scott-scott.com

Corey D. Holzer*
**HOLZER & HOLZER, LLC**
1200 Ashwood Parkway, Suite 410
Atlanta, GA  30338
Telephone: 770-392-0090
Facsimile: 770-392-0029
cholzer@holzerlaw.com

* to apply for admission pro hac vice

*Counsel for Plaintiff*

25